UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OLIN HOLDINGS LIMITED,

                              Petitioner,          21-cv-4150 (JGK)

            - against -                    MEMORANDUM OPINION AND
                                           ORDER

STATE OF LIBYA,

                              Respondent.

---

JOHN G. KOELTL, District Judge:

The petitioner, Olin Holdings Limited ("Olin"), brought
this action against the respondent, the State of Libya
("Libya"), seeking to confirm a final arbitral award (the "Final
Award") issued by the Arbitral Tribunal (the "Tribunal") of the
International Chamber of Commerce (the "ICC") in Paris, France.
See Pet., ECF No. 1-1. Libya opposes Olin's petition pursuant to
Article V(1)(c) of the Convention on the Recognition and
Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T.
2517, 330 U.N.T.S. 38 — commonly known, and referred to herein,
as the "New York Convention" — and, in the alternative, moves to
dismiss Olin's petition on forum non conveniens grounds.

For the reasons that follow, Olin's petition to confirm the
Award is **granted**, and Libya's motion to dismiss is **denied**.

                              I.

The following undisputed facts are taken from the petition;
the Agreement on the Promotion and Reciprocal Protection of
Investments between the Government of the Republic of Cyprus and

                              1

the Great Socialist Libyan Arab Jamahiriya (the "Agreement");
the Terms of Reference signed by the parties on June 29, 2015
(the "TOR"); the Partial Award on Jurisdiction issued by the
Tribunal on June 28, 2016 (the "Jurisdictional Award"); and the
Final Award.[1]

Olin is a limited liability company organized under the
laws of the Republic of Cyprus ("Cyprus"), with its principal
place of business in Cyprus. Pet. ¶ 2. Mr. Akram Abughamja, a
Libyan citizen, was Olin's Director between January 2001 and
March 2011, and again between April 2013 and October 2015, as
well as Olin's sole shareholder from January 2001 to July 2008.
Final Award 5. Libya is a foreign state within the meaning of
the Foreign Sovereign Immunities Act, 28 U.S.C. § 1603. Pet. ¶
3.

In the 1990s, Libya initiated a series of legislative and
economic reforms designed to attract foreign investment. Final
Award ¶ 80. In addition to signing bilateral investment treaties
with foreign states, Libya modified its domestic legislation to
foster foreign investments. Id. In this context, Olin decided to
invest in a dairy factory in Libya. Id. ¶ 82. During 2002 and
2003, Olin worked to obtain the necessary licenses and

---

[1] Unless otherwise noted, the Court will use the original page numbers from
the Agreement, the TOR, the Jurisdictional Award, and the Final Award in all
citations. The Agreement is located at ECF No. 1-8, at 3-14; the TOR is
located at ECF No. 19-1; the Jurisdictional Award is located at ECF No. 17-1;
and the Final Award is located at ECF No. 1-7, at 20-162.

2

authorizations from the relevant governmental entities in Libya to proceed with its investment. Id. ¶¶ 83-84.

On June 30, 2004, Cyprus and Libya (the "Contracting Parties") signed the Agreement. Id. ¶ 10. The Agreement is aimed at "creating favourable conditions for investments made by investors of each Contracting Party in the territory of the other Contracting Party." Agreement 1.[2] As relevant here, Article 2(2) requires the Contracting Parties to treat investors from the other country fairly and equitably and to give them full protection and security, and prohibits the Contracting Parties from "impair[ing] by unreasonable or discriminatory measures the management, maintenance, use, enjoyment, expansion or disposal of [such foreign investors'] investments." Id. at 3. Article 3 provides that a Contracting Party would not treat investors of the other Contracting Party less favorably than its own investors. Id. at 3-4. Article 7(1) additionally provides that investments by investors of the other Contracting Party would "not be nationalized, [or] expropriated . . ., except for [in the] public interest in accordance with due process of law, on a non-discriminatory basis and against the payment of prompt, adequate and effective compensation." Id. at 6. An investor affected by such nationalization or expropriation is given, in

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

Article 7(4), the "right, under the law of the Contracting Party

making the expropriation, to prompt review, by a judicial

authority or other competent authority . . . of its case." Id.

at 7. Finally, Article 9, entitled "Settlement of Disputes

between one of the Contracting Parties and Investors of the

Other Party," provides in subsection 2 that, in the event that

an intractable dispute were to arise between one of the

Contracting Parties and an investor of the other Contracting

Party, the dispute would "be submitted, at the choice of the

investor concerned to: (a) the competent court of the

Contracting Party in whose territory the investment was made; or

(b) the Arbitral Tribunal of the International Chamber of

Commerce in Paris."[3] Id. at 8. The Agreement went into force on

February 12, 2005. Award ¶ 10 n.2.

Later in 2005, Olin selected a site for its factory in an

industrial area in Tripoli, Libya. Id. ¶ 85. The land was owned

by Mr. Said Abughamja, Mr. Akram Abughamja's father. Id. On May

16, 2005, Olin leased the land from him. Id. ¶ 86. Olin soon

received a building permit from the Libyan governmental

authorities to commence the construction of its factory, and

shortly thereafter received an updated investment license

---

[3] Article 9(2) contains two other options through which the parties could
settle disputes, but neither of these are relevant here.

expanding the scope of Olin's investment project to include the production of fruit juices. Id. ¶¶ 87-88.

By the end of 2006, Olin had completed the construction of its factory and was ready to begin operations. Id. ¶ 91. However, on November 12, 2006, Olin received an eviction order informing Olin that "its factory has been dispossessed and requesting it to vacate the premises within 3 days." Id. ¶ 92. Unbeknownst to Olin, a Libyan governmental entity had issued a decision on October 19, 2006 (the "Expropriation Order"), expropriating a large parcel of land that included Olin's factory site (the "Expropriated Area"). Id. ¶ 93.

Within three months of Olin's receipt of the Expropriation Order, "Libya had demolished the quasi totality of the Expropriated Area, leaving Olin's factory as one of the few buildings standing." Id. ¶ 97. Olin sent several letters between November 2006 and June 2009 to Libyan authorities seeking an exemption from the Expropriation Order, to no avail. Id. ¶ 98.

On December 9, 2006, Olin initiated judicial proceedings challenging the legality of the Expropriation Order before the Tripoli Court of Appeal, First Administrative Circuit (the "Tripoli Court of Appeal"). Id. ¶ 101. In 2008, while this litigation was ongoing, Libya agreed to exempt two of Olin's competitors — one state-owned entity and the other a privately

5

owned Libyan company — from "any destruction or relocation." Id.
¶ 108.

On April 13, 2010, the Tripoli Court of Appeal found that
the Expropriation Order was procedurally improper and therefore
unlawful under Libyan law, and canceled the Expropriation Order.
Id. ¶ 109. Notwithstanding this, on August 31, 2010, Libyan
authorities sent Olin a letter demanding that Olin "evacuate the
site on top urgent basis and deliver it free of all obstacles
and people within a week[.]" Id. ¶ 110.

On December 7, 2010, Olin initiated a second set of
judicial proceedings before the South Tripoli Court of First
Instance (the "South Tripoli Court"), seeking compensation for
the harm that Olin had allegedly suffered as a result of the
Expropriation Order. Id. ¶ 112. While that case was pending, on
June 15, 2011, the Libyan authorities transferred title to the
land on which Olin's factory was built back to Mr. Said
Abughamja. Id. ¶ 115. On February 14, 2014, the South Tripoli
Court ruled that no indemnification was due because Olin had
failed to prove the harm it claimed to have suffered. Id. ¶ 120.

On July 3, 2014, Olin commenced an arbitration proceeding
against Libya before the ICC. Id. ¶ 17. Olin sought $147,882,000
as compensation for the damages it allegedly incurred as a
result of the Expropriation Order and Libya's related actions
obstructing the operation of Olin's factory. See id. Libya

participated in all aspects of the arbitration, Pet. ¶ 19, and was represented by counsel, see Award 10. The Tribunal consisted of a representative appointed by Libya, a representative appointed by Olin, and a representative appointed by the ICC. Pet. ¶ 18.

In October 2015, having found that the "obstacles erected by Libya were [too] great," id. ¶ 30, Olin "ceased all operations in its factory," Award ¶ 121.

On June 29, 2015, the Tribunal conducted a preliminary meeting in the presence of the parties. Id. ¶ 28. At this meeting, the parties agreed to and signed the TOR, which provides an overview of the arbitration. Id. ¶ 29; see generally TOR. The TOR summarizes the parties' arguments in support of and in opposition to Olin's claims, including Libya's argument that the Tribunal lacked jurisdiction to arbitrate the dispute because of Olin's litigation of the underlying dispute in Libyan courts. See id. The TOR provides that the Tribunal would determine "those [issues] resulting from the Parties' submissions . . . which are relevant to the adjudication of the Parties' respective claims and defenses, as described [in the TOR]." Id. ¶ 61. The parties also affirmed in the TOR that the Tribunal would be governed by the Rules of Arbitration of the ICC (the "ICC Rules"). Id. ¶ 70.

On June 28, 2016, the Tribunal issued a unanimous and
thorough 88-page Jurisdictional Award, concluding that Article
9(2) of the Agreement constituted an agreement to arbitrate the
parties' dispute, that Olin was not precluded from invoking the
arbitration clause by its previous lawsuits against Libya, and
that the Tribunal therefore had jurisdiction over the dispute.
See Jurisdictional Award. The Tribunal thus rejected Libya's
argument that Article 9(2) of the Agreement was a "fork-in-the-
road" clause that made litigation and arbitration mutually
exclusive. Id. ¶ 207. Among other reasons, the Tribunal noted
that Article 9(2) did not include the words "definitive,
irrevocable, or any other words suggesting that the choice of
one forum would preclude the use of another." Id. ¶ 204. This
omission was in contrast to other bilateral investment treaties
entered into by Libya, and other bilateral investment treaties
in general, which expressly stated that the choice of
arbitration or litigation is "definitive," id. ¶ 197, that the
arbitration provision "shall not apply if the investor concerned
has resorted to [litigation]," id. ¶ 198, and that the election
of litigation or arbitration "shall be final," id. ¶¶ 199, 200.
Accordingly, the Tribunal unanimously rejected Libya's objection
that Article 9(2) constituted a fork-in-the-road clause that
deprived the Tribunal of jurisdiction over the parties' dispute.
Id. ¶¶ 207, 220.

From July 3 to 5, 2017, the Tribunal held an evidentiary hearing on the merits of the dispute, during which the Tribunal heard from witnesses. Pet. ¶ 23. Nearly one year later, on May 25, 2018, the Tribunal issued its 143-page Final Award. Id. ¶ 24. The Final Award concluded that Libya had breached at least three provisions of the Agreement: Article 2(2), Article 3, and Article 7(1). Id. ¶¶ 24, 31-33. As a result, the Tribunal awarded Olin €18,225,000 in damages; $773,000 for the costs of arbitration; and €1,069,687.70 for general legal costs and expenses. Final Award ¶ 552. For all of these awards, the Tribunal awarded Olin simple interest at the commercial rate of 5% per annum from the date of the Final Award until full payment. Id. In so concluding, the Tribunal reiterated its finding that it had jurisdiction over the dispute despite Olin's decision to pursue litigation prior to commencing arbitration. Id. ¶¶ 38-40.

On December 11, 2020, Olin sought confirmation of the Final Award in the Supreme Court of the State of New York. See Pet. On May 10, 2021, Libya removed that petition to this Court based on the New York Convention, 9 U.S.C. § 201 et seq. ECF No. 1. On July 19, 2021, Libya filed an opposition to Olin's petition and moved to dismiss the petition. ECF Nos. 15-16.

## II. Petition to Confirm the Final Award

The first item before the Court is Olin's petition to
confirm the Final Award. "A petition to confirm an arbitral
award is treated as a motion for summary judgment." Pro. Sport
Serv. Fi Oy v. Puck Agency LLC, No. 19-cv-5904, 2019 WL 5884558,
at *4 (S.D.N.Y. Nov. 8, 2019). The standard for granting summary
judgment is well established. "The court shall grant summary
judgment if the movant shows that there is no genuine dispute as
to any material fact and the movant is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v.
Catrett, 477 U.S. 317, 322-23 (1986). In determining whether
summary judgment is appropriate, the court must resolve all
ambiguities and draw all reasonable inferences against the
moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 587 (1986).

### A.

Before proceeding to the merits of the parties' arguments
regarding the petition, there is the preliminary issue of what
standard of review is applicable to the Tribunal's
jurisdictional ruling.

Where an arbitral agreement is "silent on the matter of who
primarily is to decide 'threshold' questions about arbitration,
courts determine the parties' intent with the help of [two]
presumptions." BG Grp., PLC v. Republic of Argentina, 572 U.S.

10

25, 34 (2014). First, "courts presume that the parties intend courts, not arbitrators, to decide . . . disputes about 'arbitrability.'" Id. "These include questions such as whether the parties are bound by a given arbitration clause, or whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." Id. Courts are required to review decisions about arbitrability "de novo unless the record supplies 'clear and unmistakable evidence' that the [p]arties agreed to submit the issue to arbitration." Beijing Shougang Mining Inv. Co. v. Mongolia, 11 F.4th 144, 154 (2d Cir. 2021). Second, "courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration." BG Grp., 572 U.S. at 34. These procedural preconditions "include claims of waiver, delay, or a like defense to arbitrability," as well as "the satisfaction of prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate," whose effect is to "determine[] when the contractual duty to arbitrate arises, not whether there is a contractual duty to arbitrate at all." See id. at 35. The implication is that courts must review arbitral tribunals' decisions on matters falling within the second presumption "with considerable deference." Id. at 41.

11

In this case, Libya and Olin disagree about whether the Jurisdictional Award was a decision on the substantive arbitrability of the parties' dispute, or a resolution of a procedural gateway issue to arbitration. Olin is correct that it is a procedural gateway issue. Cf. Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 391-94 (2d Cir. 2011) (stating that whether the defendant, "having previously agreed to litigate against [the plaintiffs] . . ., is now estopped from accepting, has waived its right to accept, or has otherwise rejected its right to arbitration" would generally be characterized as a procedural question, but not deciding the issue because the parties had unequivocally intended the issue of arbitrability to be decided by the arbitrators). Accordingly, the question of whether the Tribunal had jurisdiction over the parties' dispute is presumptively reserved for the arbitrators. Because there is nothing that would rebut that presumption in this case, this presumption applies.

But even if Libya were correct that the Jurisdictional Award is fairly characterized as a decision on arbitrability, "there is clear and unmistakable evidence" that the parties intended this issue to be decided by the Tribunal in the first instance, and deference is therefore due. See id. at 394. It is well established in this circuit that "[w]here parties explicitly incorporate rules that empower an arbitrator to

12

decide issues of arbitrability, the incorporation serves as
clear and unmistakable evidence of the parties' intent to
delegate such issues to an arbitrator." Schneider v. Kingdom of
Thailand, 688 F.3d 68, 72 (2d Cir. 2012). While this rule is
usually invoked where the relevant rules are incorporated into
the underlying arbitration agreement, the court of appeals
recently confirmed that there is "no reason . . . that evidence
of intent to submit arbitrability issues to arbitration may be
found only in arbitral agreements, and not in subsequent
agreements reached by parties during an arbitration." Beijing,
11 F.4th at 155. Similarly, in Schneider, id., the court of
appeals held that the parties had clearly and unmistakably
agreed to arbitrate arbitrability where they had signed terms of
reference that committed the parties to use arbitral rules that
delegated arbitrability to the arbitrators, and that noted that
the tribunal "shall have the power to rule on objections that it
has no jurisdiction." Schneider, 688 F.3d at 72.

This case is nearly identical to Schneider, and there is
clear and unmistakable evidence of the parties' intent to
arbitrate arbitrability in the parties' TOR. Like the parties in
Schneider, Libya and Olin agreed in their TOR to resolve their
dispute through arbitration pursuant to a set of procedural
rules that delegated arbitrability to the arbitrators — in this
case, the ICC Rules. Article 6, section 3 of the ICC Rules

13

specifically provides that claims "concerning the existence, validity, or scope of the arbitration agreement," and "any question of jurisdiction . . . shall be decided directly by the arbitral tribunal," unless the Secretary General provides otherwise. See ICC Rules, ECF No. 19-2. And as in Schneider, the agreement between Libya and Olin to abide by this rule constitutes "clear and unmistakable evidence of their intent to arbitrate issues of arbitrability." See Schneider, 688 F.3d at 73.

Moreover, like the terms of reference in Schneider, the TOR signed by Libya and Olin contains yet further evidence that the parties agreed to arbitrate arbitrability. Specifically, the TOR provides that the Tribunal would decide all issues that were relevant to the adjudication of the parties' dispute, and those identified in the TOR itself — that is, including Libya's arguments regarding the Tribunal's jurisdiction. This provision provides further evidence that the parties clearly and unmistakably intended for the arbitrator to determine arbitrability.

Because the threshold issue in this case was a procedural one and because the parties in any event agreed to arbitrate arbitrability, the Tribunal's jurisdictional ruling is entitled to deferential review. See id. at 74.

14

B.

"Having determined that independent review of the Award is not warranted," the Court reviews the Award "only with deference." Beijing, 11 F.4th at 158. Under this standard, if the arbitrators "explain their conclusions in terms that offer even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue, however persuasively, for a different result." See Stone & Webster, Inc. v. Triplefine Int'l Corp., 118 F. App'x 546, 550-51 (2d Cir. 2004).

The parties agree that the petition is governed by the New York Convention. The New York Convention governs arbitration agreements that are "commercial" and not "entirely between citizens of the United States," 9 U.S.C. § 202, and provides for the enforcement of such agreements and the confirmation of foreign arbitral awards that arise thereunder, id. §§ 206, 207. When a party seeks to confirm an arbitral award under the New York Convention, "[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . Convention." Europcar Italia, S.p.A. v. Maiellano Tours, Inc., 156 F.3d 310, 313 (2d Cir. 1998) (citing 9 U.S.C. § 207). Article V of the New York Convention "provides the exclusive grounds for refusing confirmation under the Convention." Yusuf Ahmed Alghanim & Sons

v. Toys "R" Us, Inc., 126 F.3d 15, 20 (2d Cir. 1997).

Specifically, Article V(1) of the New York Convention provides

that a court may refuse to enforce an arbitral award where:

> (a) The parties to the agreement . . . were . . . under
> some incapacity, or the said agreement is not valid under
> the law . . .; or
> (b) The party against whom the award is invoked was not
> given proper notice of the appointment of the arbitrator
> or of the arbitration proceedings . . .; or
> (c) The award deals with a difference not contemplated
> by or not falling within the terms of the submission to
> arbitration, or it contains decisions on matters beyond
> the scope of the submission to arbitration . . .; or
> (d) The composition of the arbitral authority or the
> arbitral procedure was not in accordance with the
> agreement of the parties . . .; or
> (e) The award has not yet become binding on the parties,
> or has been set aside or suspended by a competent
> authority of the country in which, or under the law of
> which, that award was made.

Article V(2) of the New York Convention provides two additional

grounds for refusing to enforce an arbitral award: (1) if the

subject matter of the difference is not capable of settlement by

arbitration, or (2) if recognition or enforcement of the award

would be contrary to the public policy of the country in which

enforcement or recognition is sought.

"The party opposing enforcement of an arbitral award has

the burden to prove that one of the seven defenses under the New

York Convention applies." Telenor Mobile Commc'ns AS v. Storm

LLC, 584 F.3d 396, 405 (2d Cir. 2009). "The burden is a heavy

one, as the showing required to avoid summary confirmance is

high." Id.

In this case, the Tribunal carefully considered Olin's
claims that Libya had violated the terms of the Agreement by
expropriating land from Olin and otherwise obstructing Olin's
investment in the country in its 143-page Award. It also
thoughtfully and thoroughly rejected Libya's defenses to these
claims, including that the Tribunal lacked jurisdiction over the
dispute. In so doing, the Tribunal analyzed the meaning of the
relevant clauses in the Agreement, compared the wording in the
Agreement to comparable bilateral investment treaties, and
reviewed the facts of the dispute. Finally, based on the
evidence presented, the Tribunal calculated a monetary award
that, while significant, was significantly less than the amount
initially sought by Olin, and was fair and reasonable.

Based on the foregoing, there is "at least a barely
colorable justification for the outcome reached, and indeed
substantially more." See GE Transp. (Shenyang) Co. v. A-Power
Energy Generation Sys., Ltd., No. 15-cv-6194, 2016 WL 3525358,
at *5 (S.D.N.Y. June 22, 2016). The Award should therefore be
enforced unless Libya can establish that one of the seven
exclusive defenses to confirmation and enforcement of an award
under Article V of the New York Convention applies. See id.

Libya fails to carry this heavy burden. The only objection
that Libya raises to confirmation of the Award is that the
Tribunal's Jurisdictional Award is unenforceable under Article

17

V(1)(c) of the New York Convention. The court of appeals has
explained that Article V(1)(c) should be "construed narrowly,"
and should not be used to second guess the arbitrators'
decision. See Parsons & Whittemore Overseas Co., Inc. v. Societe
Generale De L'Industrie Du Papier (RAKTA), 508 F.2d 969, 976-77
(2d Cir. 1974). Yet this is precisely what Libya asks the Court
to do in urging reconsideration of the Tribunal's decision that
it had jurisdiction over the dispute. And having already
determined that the parties agreed to submit jurisdictional
issues to the arbitrators, this is plainly not a case in which
the "issue decided was not contemplated by the parties as
falling within the scope of submission." See In re Arb. between
Halcot Navigation Ltd. P'ship & Stolt-Nielsen Transp. Grp., 491
F. Supp. 2d 413, 420 (S.D.N.Y. 2007).

Libya argues that the Tribunal's Jurisdictional Award was
irrational and absurd. But the Jurisdictional Award was plainly
rational. In its 88-page opinion, the Tribunal — comprised of
representatives chosen by Libya, Olin, and the ICC, respectively
— unanimously agreed that Olin's decision to bring proceedings
in Libya did not preclude a subsequent arbitration proceeding.
In coming to this conclusion, the Tribunal considered several
factors. First, the Tribunal considered the language of the
Agreement, and Article 9(2) in particular, which was void of
words such as "definitive, irrevocable, or other words

18

suggesting that the choice of one forum preclude[s] the use of another." Jurisdictional Award ¶ 204. The Tribunal compared this wording to the language of similar bilateral investment treaties signed by Libya and others that "specifically provide[d] for the election of one agreed dispute resolution forum, to the exclusion of the others," and made clear that a party's choice was "final and definitive." Id. ¶ 201. The Tribunal concluded that "if Cyprus and Libya, the contracting states, chose not to include the words definitive, irrevocable, or any other words suggesting that the choice of one forum would preclude the use of another under Article [9(2)] of the [Agreement], the Tribunal should give plain and full effect to their will." Id. ¶ 204. This conclusion is eminently reasonable, and there is at least a barely colorable justification for it. Cf. GE Transportation, 2016 WL 3525358, at *5.

Second, the Tribunal rejected Libya's argument that the use of the word "or" in Article 9(2) — providing that disputes would be submitted, at the choice of the investor concerned, to (a) a competent court of the Contracting Party, or (b) the Arbitral Tribunal of the ICC — made the choices mutually exclusive. After careful consideration of the parties' respective arguments, the Tribunal determined that "or could plausibly have an inclusive meaning." Jurisdictional Award ¶ 205. The Tribunal was also persuaded by the fact that the Arabic translation of the

19

Agreement was missing the word "or," which constituted "further indication that Article [9(2)] is only laying down a list of different fora that are all available to the investor in case of a dispute with the host State and is not a 'fork-in-the-road' clause." Id. There is nothing irrational about this finding, and the Tribunal was colorably justified in so holding.

Finally, the Tribunal considered that Article 7(4) specifically, and separately from Article 9(2), "grants investors the right to pursue court proceedings in the event of an expropriation." Id. ¶ 206. The Tribunal agreed with Olin that holding Article 9(2) of the Agreement as a fork-in-the-road provision would render Article 7(4) superfluous. See id.; see also id. ¶ 164. If Article 9(2) made litigation and arbitration mutually exclusive, Article 7(4) would be nullified by an investor's choice of arbitration — and vice versa — yielding an "absurd result." See id. ¶ 150(g). This finding further buttressed the Tribunal's wholly reasonable conclusion that Olin's decision to bring judicial proceedings in Libyan state courts did not preclude a subsequent arbitration proceeding before the ICC, and that the Tribunal therefore had jurisdiction over the dispute.

Based on the limited review that is appropriate in this case — and finding no reason why any of the exclusive defenses to confirmation of a foreign arbitral award under the New York

20

Convention applies — Olin's petition to confirm the Final Award
is **granted.**

### III. Motion to Dismiss

Also pending is Libya's motion to dismiss Olin's petition
on forum non conveniens grounds. Federal courts have discretion
to dismiss a case on the ground of forum non conveniens "when an
alternative forum has jurisdiction to hear a case, and when
trial in the chosen forum would establish oppressiveness and
vexation to a [respondent] out of all proportion to [the
petitioner's] convenience, or when the chosen forum is
inappropriate because of considerations affecting the court's
own administrative and legal problems." See Am. Dredging Co. v.
Miller, 510 U.S. 443, 447-48 (1994); see also Constellation
Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd., 801 F.
Supp. 2d 211, 218 (S.D.N.Y. 2011). Dismissal for forum non
conveniens reflects a court's assessment of a "range of
considerations, most notably the convenience to the parties and
the practical difficulties that can attend the adjudication of a
dispute in a certain locality." Quackenbush v. Allstate Ins.
Co., 517 U.S. 706, 723 (1996). The party moving for dismissal on
the basis of forum non conveniens carries the burden of
establishing that it applies. See Bank of Credit & Com. Int'l
(Overseas) Ltd. v. State Bank of Pakistan, 273 F.3d 241, 246 (2d
Cir. 2001).

The court of appeals has established a three-step framework for resolving a motion to dismiss based on forum non conveniens that requires: (1) determining the degree of deference to be afforded to the petitioner's choice of forum; (2) examining whether an adequate alternative forum exists; and (3) balancing the private and public factors enumerated by the United States Supreme Court in Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947). See Iragorri v. United Techs. Corp., 274 F.3d 65, 73-74 (2d Cir. 2001). The Court considers each in turn.

**A.**

First, the Court must determine the degree of deference that should be afforded to the petitioner's choice of forum. See id. at 70-73. The United States Supreme Court in Gulf Oil generally instructed that "unless the balance is strongly in favor of the [respondent], the [petitioner's] choice of forum should rarely be disturbed." Gulf Oil, 330 U.S. at 508. The court of appeals has interpreted Gulf Oil to mean that "a court reviewing a motion to dismiss for forum non conveniens should begin with the assumption that the [petitioner's] choice of forum will stand." Iragorri, 274 F.3d at 71.

"[T]he degree of deference given to a [petitioner's] forum choice varies with the circumstances." Id. While parties who file suit in the district in which they reside are entitled to great deference, less deference is owed to foreign parties suing

in the United States. See id. The court of appeals has
instructed that the greater the petitioner's "bona fide
connection to the United States and to the forum of choice and
the more it appears that considerations of convenience favor the
conduct of the lawsuit in the United States," the greater
deference that will be given. Id. at 72. On the other hand, the
more it appears that the petitioner's choice of a United States
forum was "motivated by forum-shopping reasons . . . the less
deference the [petitioner's] choice commands." Id.

Applying the sliding scale approach established by Iragorri
to this case, Olin's choice of forum is entitled to little
deference. Olin is a Cypriot entity with no ties to the United
States, and this entitles it to less deference under Iragorri.
See id. at 71. Furthermore, the Agreement was not drafted in the
United States; the arbitration was conducted in Paris, France;
and all of the events giving rise to the arbitration took place
outside of the United States, in Libya. These facts indicate a
lack of connection between Olin and this district, reducing the
deference that is due at this first step of the analysis. See
id. at 72.

While Olin's choice of forum is therefore not entitled to
much deference, Olin's choice is still entitled to some
deference. A portion of the damages owed to Olin under the Final
Award are in United States dollars, the Final Award was written

in English, and the Agreement and the Final Award are governed by the New York Convention. See <u>Thai-Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic</u>, No. 10-cv-5256, 2011 WL 3516154, at *10 (S.D.N.Y. Aug. 3, 2011), <u>aff'd</u>, 492 F. App'x 150 (2d Cir. 2012), <u>and vacated on other grounds</u>, 997 F. Supp. 2d 214 (S.D.N.Y. 2014), <u>aff'd</u>, 864 F.3d 172 (2d Cir. 2017). Moreover, because this is a summary proceeding to confirm an arbitration award, "it is highly unlikely that [Olin] will gain a tactical advantage through the local laws or the inconvenience and expense to [Libya] resulting from litigation in New York." See <u>Sistem Muhendislik Insaat Sanayi Ve Ticaret, A.S. v. Kyrgyz Republic</u>, No. 12-cv-4502, 2016 WL 5793399, at *5 (S.D.N.Y. Sept. 30, 2016), <u>aff'd</u>, 741 F. App'x 832 (2d Cir. 2018). And "[a]lthough the events at issue in the underlying arbitration took place outside the United States, that consideration has less significance here because the facts underlying the dispute are not at issue in this proceeding." See <u>id.</u> These facts entitle Olin to at least some deference. See <u>id.</u>

Balancing the above factors, and heeding the United States Supreme Court's guidance that the petitioner's choice of forum should rarely be disturbed, the plaintiff's choice of forum is entitled to a small degree of deference.

**B.**

"The deference given to a [petitioner's] choice of forum does not dispose of a forum non conveniens motion. It is only the first level of inquiry." Iragorri, 274 F.3d at 73. The second step in the Iragorri framework requires the respondent to identify an adequate alternative forum where the respondent is amenable to process. See id.

Libya offers Libya and France as alternative fora. While Olin puts forth reasons that purport to suggest that Libya may be an inappropriate forum, Olin offers no reason to doubt that this case could be brought in France. Accordingly, there is at least one adequate alternative forum to adjudicate this dispute.

**C.**

Finally, the Court weighs the private and public interest factors set forth in Gulf Oil. The private factors to be considered are: (1) the relative ease of access to sources of proof; (2) the convenience of wiling witnesses; (3) the availability of compulsory process for attaining the attendance of unwilling witnesses; and (4) the other practical problems that make trial easy, expeditious, and inexpensive. Gulf Oil, 330 U.S. at 508. The public interest factors are: (1) court congestion; (2) avoiding difficult problems in conflict of laws and the application of foreign law; (3) the unfairness of imposing jury duty on a community with no relation to the case;

and (4) the interest of communities in having local disputes decided at home. Id. at 508-09. The respondent bears the burden of establishing that the "balance of private and public interest factors tilts heavily in favor of the alternative forum." Sistem Muhendislik, 2016 WL 5793399, at *5.

Libya has not met this burden. "[T]his case does not involve the typical difficulties associated with conducting discovery or trial abroad," and therefore this case is similar to most summary proceedings to confirm an arbitral award in which the private interest factors do not weigh in favor of forum non conveniens dismissal. See id.; see, e.g., Constellation Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd., 801 F. Supp. 2d 211, 220 (S.D.N.Y. 2011) ("With respect to confirmation of the arbitration awards against [the respondent], the relevant sources of proof . . . are already before this Court. As discussed . . . , no additional evidence or witnesses are necessary. Thus, confirmation against [the respondent] can proceed relatively easily, expeditiously, and inexpensively in this Court."). "For similar reasons, the public interest factors also weigh against dismissal. Summary proceedings only mildly contribute to court congestion and do not impose a burden on the local community in connection with jury duty." See Sistem Muhendislik, 2016 WL 5793399, at *5.

Libya's arguments to the contrary are unavailing. The thrust of Libya's argument is that Olin has failed to identify any bona fide reason for seeking enforcement in the United States. But this reverses the burden on this motion, which is borne by Libya. Because Libya fails to identify even one private or public interest factor that weighs in its favor — let alone heavily in its favor — the Court will not exercise its discretion to dismiss this case in favor of an alternative forum. See Iragorri, 274 F.3d at 74-75 ("The action should be dismissed only if the forum is shown to be genuinely inconvenient and the selected forum significantly preferable."). Libya's motion to dismiss is accordingly **denied.**

## CONCLUSION

For the foregoing reasons, Olin's petition to confirm the Final Award is **granted,** and Libya's motion to dismiss is **denied.**

The Clerk is directed to enter a judgment in favor of the petitioner in the amount of €19,294,687.70 in compensation and legal costs, plus $773,000 in ICC costs, together with interest at the rate of 5% from May 25, 2018 to the date judgment is entered. The Clerk is directed to close all pending motions and to close this case.

**SO ORDERED.**

Dated:    New York, New York
          March 22, 2022

          John G. Koeltl
          **United States District Judge**

27